IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

In Re: AutoZone, Inc., Wage and Hour
Employment Practices Litigation

_____/

No.: 3:10-md-02159-CRB
Hon. Charles R. Breyer

**ORDER GRANTING IN PART AND
DENYING IN PART ELLISON
MOTION FOR CLASS
CERTIFICATION;
DENYING ESCALANTE MOTION
FOR CLASS CERTIFICATION**

Plaintiffs in this labor case, current and former employees of Defendant AutoZone

Inc., have filed two separate motions to certify five separate subclasses. See Ellison Mot.

(dkt. 95-1)[1]; Escalante Mot. (dkt. 93).[2]  As explained below, the Court GRANTS in part (as

to the rest break subclass) and DENIES in part (as to all other subclasses) the Ellison Motion,

and DENIES the Escalante Motion.

I.      **BACKGROUND**

Defendant operates hundreds of retail auto parts stores in California.  Ellison Mot. at

---

[1] The Ellison Motion was brought by Plaintiffs Jimmy Ellison (individual case no. 06-7522),
William Doland (individual case no. 10-2723), and Lynetta Ellison (individual case no. 11-5275).

[2] The Escalante Motion was brought by Plaintiff Haydee Escalante (individual case no. 10-4900).

United States District Court
For the Northern District of California

3. During the proposed class periods – ranging from 2002 to the present – Defendant employed thousands of non-exempt employees in California. Id. Defendant estimates the total putative class size as over 30,000. Opp'n to Ellison Mot. at 2. At the store level, all employees are non-exempt from overtime, including the store manager. Id. Store employees are referred to as either "Grey Shirts," indicating those with management responsibilities, such as store managers and assistant store managers, or "Red Shirts," indicating those who report to and take direction from the Grey Shirts. Id. at 2-3.

   In two separate motions, Plaintiffs seek certification of five different subclasses: (1) those subject to rest break violations; (2) those who worked off-the-clock without pay; (3) those subject to meal break violations;[3] (4) those whom Defendant failed to reimburse for the use of their personal vehicles for work-related duties[4]; and (5) those whom Defendant reimbursed mileage for the use of their personal vehicles for work-related duties at a rate of thirty-cents per mile.[5][6]

## II.   LEGAL STANDARD

   Plaintiffs bear the burden of proving that certification is appropriate. See Hawkins v.

---

[3] These first three subclasses are addressed in the Ellison Motion.

[4] This is really two subclasses: one for whom the failure to reimburse violated California Labor Code § 2802 and the other whom the failure to reimburse constituted unlawful, unfair and/or fraudulent business acts under California's UCL. The latter subclass is derivative of the former, and the legal analysis is identical for both; accordingly this Order will treat this category of plaintiffs as a single subclass.

[5] Again, this is really two subclasses: one for whom the thirty-cent per mile reimbursement violated labor law and the other whom the thirty-cent per mile reimbursement constituted unlawful, unfair and/or fraudulent business acts under California's UCL. The latter subclass is derivative of the former, and the legal analysis is identical for both; accordingly this Order will treat this category of plaintiffs as a single subclass.

[6] These last two subclasses are addressed in the Escalante Motion.

United States District Court
For the Northern District of California

Comparet-Cassani, 251 F.3d 1230, 1238 (9th Cir. 2001).  District courts are to rigorously analyze whether the class action allegations meet the requirements of Federal Rule of Civil Procedure 23.  Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 161 (1982).  "Because the early resolution of the class certification question requires some degree of speculation, however, all that is required is that the Court form a 'reasonable judgment' on each certification requirement.  In formulating this judgment, the Court may properly consider both the allegations of the class action complaint and the supplemental evidentiary submissions of the parties." In re Citric Acid Antitrust Litig., No. 95-1092, C-95-2963, 1996 WL 655791, at *2 (N.D. Cal. Oct. 2, 1996) (citing Blackie v. Barrack, 524 F.2d 891, 900-901 & n.17 (9th Cir. 1975)).  Motions for class certification should not become occasions for examining the merits of the case.  See Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 293 (2d Cir. 1999).  Nonetheless, the Supreme Court recognized in Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551 (2011), that a court's "rigorous analysis" on class certification will frequently "entail some overlap with the merits of the plaintiff's underlying claim."

Rule 23 establishes a two-step procedure for analyzing class certification.  Initially, the following four requirements of Rule 23(a) must be satisfied: (1) numerosity, (2) common questions of law or fact, (3) typicality, and (4) adequate representation.  Once those four requirements are met, plaintiffs must show that the lawsuit qualifies for class action status under Rule 23(b).

First, the requirement of numerosity is that the class be so numerous that joinder of all members individually would be impracticable.  See Fed. R. Civ. P. 23(a)(1); Staton v.

Boeing, 327 F.3d 938, 953 (9th Cir. 2003).  "Although there is no exact number, some courts have held that numerosity may be presumed when the class comprises forty or more members."  See Krzesniak v. Cendant Corp., No. 05-05156, 2007 WL 1795703, at *7 (N.D. Cal. June 20, 2007).

Second, the requirement of commonality demands that there be "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  The showing required for Rule 23(a)(2) is "less rigorous" than the related requirements of Rule 23(b)(3) (discussed below).  See Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019-20 (9th Cir. 1998).  "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class."  Id. at 1019.  Notably, despite the "permissive[]" standard, id., commonality was a hurdle the plaintiffs in Dukes, 564 U.S. 2541, could not clear.  The Court explained in that case: "What matters to class certification . . . is not the raising of common 'questions' – even in droves – but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."  Id. at 2551(internal quotation marks omitted) (emphasis in original).

Third, the requirement of typicality is met if "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Representative claims need only be "reasonably co-extensive with those of absent class members; they need not be substantially identical."  See Hanlon, 150 F.3d at 1020.

Fourth, the requirement of adequate representation asks whether the representative

4

"will fairly and adequately protect the interests of the class."  See Fed. R. Civ. P. 23(a)(4).

Courts are to inquire (1) whether the named plaintiffs and counsel have any conflicts of

interest with the rest of the class and (2) whether the named plaintiff and counsel will

prosecute the action vigorously for the class.  See Hanlon, 150 F.3d at 1020.

In addition to the elements of Rule 23(a), a plaintiff must also demonstrate that the

action can be appropriately certified under Rules 23(b)(1), (b)(2), or (b)(3).   Rule 23(b)(1)

provides that a class may be maintained where 'prosecuting separate actions by or against

individual class members would create a risk of' either "(A) inconsistent or varying

adjudications," or "(B) adjudications . . . that, as a practical matter, would be dispositive of

the interests of the other members not parties to the individual adjudications or would

substantially impair or impede their ability to protect their interests."  Rule 23(b)(2) applies

when "the party opposing the class has acted or refused to act on grounds that apply

generally to the class, so that final injunctive relief or corresponding declaratory relief is

appropriate respecting the class as a whole."  Rule 23(b)(3) provides that a class may be

maintained where "questions of law or fact common to class members predominate over any

questions affecting only individual members," and a class action would be "superior to other

available methods for fairly and efficiently adjudicating the controversy."[7]

## III.   DISCUSSION

This Order is organized by subclass; it will discuss: (A) the rest break subclass; (B)

the off-the-clock subclass; (c) the meal break subclass; (D) the no travel reimbursement

---

[7] The Ellison Motion relies on Rule 23(b)(3).  See Ellison Mot. at 5.  The Escalante Motion
relies on Rules 23(b)(1) and 23(b)(3).  See Escalante Mot. at 17.

subclass; and (E) the thirty-cent per mile reimbursement subclass.

**A.    Rest Break Subclass**

Plaintiffs Jimmy Ellison, William Doland and Lynetta Ellison seek to certify a subclass defined as:

> All non-exempt or hourly paid employees who have been employed at Defendant's retail stores in the State of California at any time on or after July 29, 2005 until the date of certification.

Ellison Mot. at 4.  Plaintiffs' proposed rest break subclass challenges the legality of Defendant's rest break policy.  Ellison Mot. at 5-6.  Wage Order No. 7 provides in part that an "authorized rest period time shall be based on the total hours worked daily at the rate of ten (10) minutes net rest time per four (4) hours of major fraction thereof."  8 Cal. Code of Regs. § 11070, subd. 12(A).  The Supreme Court of California recently clarified in Brinker Restaurant Corp. v. Superior Court, 53 Cal. 4th 1004, 1051 (2012) that such language means that "[e]mployees are entitled to 10 minutes' rest for shifts from three and one-half to six hours in length, 20 minutes for shifts of more than six hours up to 10 hours, 30 minutes for shifts of more than 10 hours up to 14 hours, and so on."  Plaintiffs' theory is simply that Defendant has a policy of providing fewer than the required number of rest breaks.  Ellison Mot. at 6-7.  Although Defendant raised legitimate questions about the manageability of such a subclass, the Court will grant certification, with the understanding that the class can be decertified if Defendant's manageability concerns are borne out.

**1.    Relevant Evidence**

Throughout the relevant time period, Defendant had a written rest break policy, applicable to all California AutoZone stores, which provided:

United States District Court
For the Northern District of California

> An AutoZoner who works 4 hours per day is provided 1 break period of 10 consecutive minutes; an AutoZoner who works 8 hours per day is provided 2 break periods of not less than 10 consecutive minutes.

Ex. B at ADML000794; Ex. C at ADML003809.

There are significant evidentiary disputes in connection with Defendant's interpretation and implementation of this policy. Although Plaintiffs initially asserted that "Defendant's designated witness admitted that the AutoZone rest break policy does not authorize or permit a second rest break unless an employee works eight hours or more in a day," the witness whose testimony Plaintiffs cite is Azeem Sikandar. See Ellison Mot. (citing Sikandar Dep. at 7:5-23; 77:1-78:4; Ex. A).[8] Sikandar was not Defendant's person most knowledgeable on the subject of rest breaks, and Defendant even objected to the questioning of Sikandar on rest breaks, arguing that it was beyond the scope of his designation. See Waggoner Decl. Ex. E (30(b)(6) notice); Ex. F (objections to 30(b)(6) notice, stating in part "nor is Azeem Sikandar an appropriate witness on this topic"); Sikandar Dep. at 77:10-78:4). Sikander's testimony does not bind Defendant. See Detoy v. City & Cnty. of S.F., 196 F.R.D. 362, 367 (N.D. Cal. 2000).

Tim Young was Defendant's person most knowledgeable on the subject of rest breaks. See Waggoner Decl. Ex. G. Plaintiffs did not cite Young's testimony on this subject in their opening brief, but, in their Reply, they point to two notable pieces of evidence. See Ellison Reply at 3-4. The first is an email sent to all California store managers (and approved by Young) which included the following "Manager's Action Plan" – "Ensure that AutoZoners

---

[8] The portion of the deposition cited in fact states Sikandar's belief that an employee must work a total of eight hours to get two breaks. Id.

who work 4 hours or more, are provided 1 break period of not less than 10 consecutive

minutes" and "Ensure that AutoZoners who work 8 hours or more, are provided 2 break

periods of not less than 10 consecutive minutes."  Cheng Decl. Ex. A.  The second is an

excerpt of Young's deposition testimony, in which he asserts that he believes that the email

is "reflective of the current rest break policy in California."  Id. Ex. B.  Defendant argues that

the Court ought not consider either piece of Young evidence, because it was improper for

Plaintiffs to include it for the first time in Reply.  See Def. Obj. to Ellison Reply Ev. at 2

(citing Golden W. Fin. v. WMA Servs., Inc., No. 02-5727 CRB, 2003 U.S. Dist. LEXIS

4100, at *12-13 (N.D. Cal. Mar. 13, 2003).  At the motion hearing, Plaintiffs explained that

they considered the Young evidence rebuttal evidence.  The Court is inclined to give

Plaintiffs the benefit of the doubt and to consider the Young evidence; nonetheless, the

Court's conclusion as to the subclass is the same even in the absence of such evidence.

Defendant offers the testimony of Carlos Jon, a Divisional Human Resources

Manager at AutoZone, who declares that "rest break practices and procedures are highly

variable between stores," as they are determined by individual store managers, but that:

> If a store employee works a shift of less than 4 hours and decides to take a rest break
> of 10 minutes or more, AutoZone allows the employee to do that, and the employee is
> paid for that time. . . . Similarly, if a store employee works a shift of over 6 hours but
> less than 8 hours and takes a second rest break, AutoZone allows that and the
> employee will be paid for the time. . . .

Jon Decl. ¶ 9.  In fact, Jon asserts that "it is the expectation that at California stores,

AutoZoners will take rest breaks every two hours."  Id.

Plaintiffs Jimmy Ellison, Doland, and Lynetta Ellison submit their own depositions

and declarations, in which each claims to have lost rest breaks.  See Jimmy Ellison Decl. ¶ 9;

United States District Court
For the Northern District of California

Jimmy Ellison Dep. at 145:17-147:23; 151:8-16; 155:24-156:3; 169:10-15; 172:11-16; Ex. 7;

Doland Decl. ¶ 9; Lynetta Ellison Decl. ¶ 5.  Defendant, in turn, submits 117 declarations

from putative class members attesting that they knew they were authorized and permitted to

take first and second rest breaks if working three-and-a-half or six hour shifts.

See Waggoner Decl. Ex. B.[9]

### 2.    Defendant's Arguments

Defendant makes the following arguments in opposition to certification of a rest break

subclass: (a) it was not given adequate notice of the rest break claim; (b) the proposed class is

not ascertainable and overbroad; (c) common questions do not predominate; and (d)

Plaintiffs' claims are not typical.  At the motion hearing, Defendant made the related

argument that (e) the case is not manageable.

### a.    No Notice of Rest Break Claims

Defendant complains that Plaintiffs "did not disclose their contention that AuoZone

failed to authorize and permit rest breaks after 3-1/2 hours or 6 hours of work."  Ellison

Opp'n at 8.  Not so.  In responses to interrogatories, Plaintiffs stated: "Plaintiffs are of the

information and [belief] that every employee of Defendant, both current and former, or the

majority thereof, were not provided with an uninterrupted, 10 minute rest period, when for

every four hours of work or major fraction thereof."  See Waggoner Decl. Ex. J No. 13.  This

---

[9] Note that Plaintiffs object to many of the declarations Defendant submitted in connection with its Opposition because, they say, Defendant failed to disclose the witnesses pursuant to Federal Rule of Civil Procedure 26(a) and 26(e).  See Ellison Obj.  However, in its separately-filed Opposition to Plaintiffs' Reply evidence, Defendant responds that it did disclose the applicable evidence to Plaintiffs, identifying 82 individuals in its initial disclosures and then providing three sets of supplemental disclosures.  See Def. Obj. at 4.  Defendant also argues that Plaintiffs, too, failed to disclose their evidence until after the discovery cut-off and the filing of class certification papers.  Id.  The Court will permit each party's evidence on this subject.

**United States District Court**
For the Northern District of California

argument therefore fails.

### b.    Overbroad/Not Ascertainable

Defendant argues, too, that the proposed class is overbroad because "Plaintiffs do not identify any common policy or practice that allegedly affected all of the over 30,000 putative class members," see Ellison Opp'n at 12, and that it is not ascertainable because its members are only those employees who worked between three-and-a-half and four hours, or between six and sight hours, and "it is impossible to identify such individuals," id. at 16.  Again, the Court disagrees.  Plaintiff's theory is based on the rest break policy, which applies to all of Defendant's California employees.  See In re Whirlpool Corp. Front Loading Washer Prods. Liab. Litig., 678 F.3d 409, 420 (6th Cir. 2012) (class not overbroad so long as challenged practice is "premised on a ground that is applicable to the entire class").  For that reason, the class is also ascertainable: Defendant can identify all California employees during the class period.  Accordingly, this argument also fails.

### c.    Common Questions Do Not Predominate[10]

Defendant's argument that common questions do not predominate has two components: first, that the policy is not *per se* unlawful, and second, that AutoZone does not really follow it.

As to the first point, Defendant argues that while its rest break policy "does not state expressly that AutoZoners who work shifts of over 3-1/2 hours or over 6 hours get one and two rest breaks, neither does it prohibit first or second rest breaks for employees who work

---

[10] The Court collapses the Rule 23(a)(2) commonality inquiry and the Rule 23(b)(3) predominance inquiry into a single discussion, in keeping with the parties' treatment of these issues.

such shifts." Ellison Opp'n at 13. Defendant reasons that "[t]he analysis might be different if the policy stated that 'only' AutoZoners who work 4 hours or 8 hours get first or second rest breaks, or 'a minimum' or 4 or 8 hours, but that is not what the policy says." Id. at 14 (citing Wong v. AT&T Mobility Servs., LLC, No. 10-8869, 2011 U.S. Dist. LEXIS 125988, at *16 and n.11 (C.D. Cal. Oct. 20, 2011) (certification due to absence of a policy is improper)).

That reasoning is not persuasive. There is nothing terribly ambiguous about a policy that says that someone "who works 4 hours per day is provided 1 break period" and someone "who works 8 hours per day is provided 2 break periods." See Ex. B at ADML000794; Ex. C at ADML003809. Moreover, the rest break policy in Brinker, 53 Cal. 4th at 1033, was no more explicit, stating "If I work over 3.5 hours during my shift, I understand that I am eligible for one ten minute rest break for each four hours that I work." That policy did not include the word "only," or the phrase "but no more than that one rest break," and it did not need to; the Supreme Court of California concluded that "[c]lasswide liability could be established through common proof if [plaintiff] were able to demonstrate that, for example, Brinker under this uniform policy refused to authorize and permit a second rest break for employees working shifts longer than six, but shorter than eight, hours." Id. at 1033.

As to the second point, Defendant points to its 117 declarations from putative class members stating that they were authorized and permitted to take first and second rest breaks if working over three-and-a-half or six hours, and to Jon's assertion that "it is the expectation that at the California stores, AutoZoners will take rest breaks every two hours." See Ellison Opp'n at 13-14. Defendant argues that both conflict with the notion that the rest break policy

11

was uniformly applied.  Id. at 14 ("By contrast, Plaintiffs have no evidence of common

interpretation or application of the policy."); id. at 15 ("courts have denied certification of

rest break claims where, as here, the implementation and application of a policy varies in

practice.").

Of course, the email sent to all California store managers reiterating the "Manager's

Action Plan" for following its rest break policy ("AutoZoners who work 4 hours or more, are

provided 1 break period"), see Cheng Decl. Ex. A, and Young's deposition testimony

asserting that he believes that the email is "reflective of the current rest break policy in

California," see id. Ex. B, gives the Court some sense of the policy's implementation.

Nonetheless, even without the Young evidence, there is no dispute that there is a uniform

policy here.

In Kurihara v. Best Buy Co., Inc., No. 06-1884, 2007 U.S. Dist. LEXIS 64224 MHP,

at *6 (N.D. Cal. Aug. 30, 2007), Judge Patel was confronted with a uniform inspection

policy, in which Best Buy employees were routinely inspected to prevent loss of inventory.

Defendants asserted that variations among employee experiences precluded class

certification, and submitted "declarations from several employees stating that they are not

inspected when they enter the store," as well as declarations asserting that "the written

policies themselves are not uniformly followed," varying in duration and frequency,

fluctuating from day to day, and varying based on weather and climate.  Id. at *6-*8

("Defendant therefore asserts that it is impossible to determine whether, how frequently, and

for what length of time any employee is subject to inspection without examining the

employee's individual circumstances and considering a host of factors unique to each

employee.").

The court explained that "courts' discomfort with individualized liability issues is assuaged in large part where the plaintiff points to a specific company-wide policy or practice that allegedly gives rise to consistent liability." Id. at *28. Although the court acknowledged that "a mere allegation of a company-wide policy does not compel class certification," it noted that the plaintiff there had "provided substantial evidence of a company-wide policy where employees are subject to inspections, and are not compensated for the time spent on those inspections." Id. at *29. The court concluded: "Although Plaintiff has submitted little or no evidence as to the implementation of that policy, the detailed nature of the policy itself, and the reasonable inferences which can be drawn from them, constitute sufficient evidence to satisfy plaintiff's burden as to the predominance of common questions." Id. The court added that the defendant's selective sampling of employee declarations and other data were "insufficient to inject fatal uncertainty into the question of liability." Id. at *29-*30. This Court finds Judge Patel's reasoning persuasive.

Other cases have likewise held that claims based on a uniform policy are entitled to class certification. See, e.g., Brinker, 53 Cal. 4th at 1020, 1033 (finding, despite fact that "Brinker submitted hundreds of declarations in support of its opposition to class certification," that "[c]laims alleging that a uniform policy consistently applied to a group of employees in violation of the wage and hour laws are of the sort routinely, and properly, found suitable for class treatment."); Vedachalam v. Tata Consultancy Servs., Ltd., No. 06-0963, 2012 U.S. Dist. LEXIS 46429, at *37-*39 (N.D. Cal. April 2, 2012) (rejecting defendants' argument that "this policy was not always uniformly applied," citing Kurihara);

United States District Court
For the Northern District of California

In re Taco Bell Wage & Hour Actions, No. 07-1314, 2012 WL 5932833, at *6 (E.D. Cal. Nov. 27, 2012) (where defendants admitted that there was a uniform policy but argued that "as a matter of practice, the policy is carried out in a variety of ways," the court relied on Brinker and found that it was sufficient that there was "a corporate policy that was equally applicable to all employees").

Because this subclass's claims are based entirely on the legality of Defendant's uniform written rest break policy, the Court concludes that common questions predominate.

### d.    Not Typical

Finally, Defendant argues that Plaintiffs' claims are not typical.  See Ellison Opp'n at 16-17.  Defendant asserts that Jimmy Ellison is not typical because he "does not contend that he did not receive a first rest break if he worked a shift over 3-1/2 hours but less than 4 hours," and also because he received a memorandum properly explaining that he could take a rest break at three-and-a-half and again at over six hours, and so his claims will be subject to a unique defense.  But Ellison's claim of being denied a second rest break is "reasonably co-extensive with those of absent class members" who were denied first rest breaks. See Hanlon, 15 F.3d at 1020.  Defendant also maintains that Doland and Lynetta Ellison are not typical because they sometimes got rest breaks.  See Ellison Opp'n at 16-17 (citing Doland Decl. ¶ 9; Doland Dep. at 77:1-18, 112:11-17; Lynetta Ellison Decl. ¶ 5).  But this is more an issue of damages than of typicality; Plaintiffs are typical of the proposed class because they were subject to the same policy as the proposed class.  This argument therefore fails.

### e.    Not Manageable/Superior

**United States District Court**
For the Northern District of California

The Court interprets Defendant's argument about manageability to be a challenge to whether "a class action is superior to other available methods for fairly and efficiently adjudicating" this controversy.  <u>See</u> Rule 23(b)(3).  Pertinent to that determination is: (a) the class members' interests in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already begun by or against class members; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (d) the likely difficulties in managing a class action.  Fed. R. Civ. P. 23(b)(3).

Defendant does not argue that individual putative class members have any interest in individually controlling their cases.  Nor does the Court find that there is any impediment associated with litigation already begun by class members (see discussion of Lynetta Ellison's previous litigation, below), or that concentrating the claims in this forum would be problematic.  However, Defendant does raise legitimate concerns about manageability.  If indeed the Court believed that it would need to make endless individualized inquiries about whether and how often putative class members got rest breaks, and all of the different reasons why rest breaks did not occur, it would agree with Defendant that the case was unmanageable.  <u>See</u> <u>Haley v. Medtronic, Inc.</u> 169 F.R.D. 643, 651-52 (C.D. Cal. 1996) ("even if seventy-five percent of the issues are common questions – assuming seventy-five percent is enough to establish "predominance" – if the other twenty-five percent that are individual in nature are significant enough, class action treatment might not be 'superior' after all.").  As the Court stated at the motion hearing, it would like to avoid a nightmare of individual practices.

**United States District Court**
For the Northern District of California

However, Plaintiffs have convinced the Court, for now, that this will not happen. First, <u>Brinker</u>, 53 Cal.4th at 1033, reiterated that – despite the hundreds of declarations supporting defendant's position in that case – "'if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.'"  As Justice Werdegar explained in her concurring opinion:

> [A] defense that hinges liability *vel non* on consideration of numerous intricately detailed factual questions . . . is different from a defense that raises only one or a few questions and that operates not to extinguish the defendant's liability but only to diminish the amount of a given plaintiff's recovery.  We have long settled that individual damages questions will rarely if ever stand as a bar to certification.

<u>Id.</u> at 1054 (Werdegar, J., concurring).  Here, AutoZone's liability will be based on whether its rest break policy violates the law or does not – the policy is a fact common to all class members.  That class members will need to individually prove their damages might be daunting, but it is not a bar to certification.

Second, Plaintiffs' counsel argued at the motion hearing that there might well be records that would render the case more manageable.  He urged, "we still have merits discovery to conduct," and informed that Court that AutoZone conducted audits of its rest breaks, which Plaintiffs have yet to see.  He also suggested that a jury could presume both that AutoZone's policy violates the law and that everyone who worked for a given number of hours was damaged, and that AutoZone could then come forward and demonstrate that its policy was not always applied.  Whether this would work or would ultimately prove impractical remains to be seen, but the Court is willing to let Plaintiffs proceed.  The alternative – thirty thousand individual actions about the same policy – seems far more

problematic.

Accordingly, the Court concludes that a class action is superior to other methods for resolving the parties' dispute.

### 3.    Additional Requirements for Certification

Defendant does not dispute that Plaintiffs have met the requirements of numerosity, and the Court indeed finds that that requirement has been met.  Defendant does argue that Plaintiffs and their counsel will not adequately represent the class, because (1) there is a conflict between Gray Shirts, who are responsible for permitting employees to take rest breaks, and Red Shirts, who are the victims of such discretion; and (2) Lynetta Ellison has already dismissed her class claims with prejudice, and Doland does not know what his claims are.  See Ellison Opp'n at 23-24.  Both arguments are unavailing (as is a third, addressed above, about inadequate disclosure of Plaintiffs' theories).  First, there is no conflict among the putative class members where Plaintiffs' theory is that Defendant's policies, not the store managers, are at fault.  Second, Doland's testimony taken as a whole demonstrates an understanding of the case, and Doland has participated adequately by responding to and propounding written discovery, and preparing for and giving a deposition.  In addition, the Court will not apply *res judicata* to bar Lynetta Ellison's claims.  Ellison had filed a complaint in Los Angeles County Superior Court, and then the case was removed to district court.  See Ellison Reply at 19.  Ellison then filed an amended complaint striking her class allegations relating to race discrimination and alleging them in her individual capacity.  Id. at 20.  In doing so, she inadvertently alleged the instant causes of action in her first amended complaint.  Id.  In order to avoid confusion, Ellison attempted to dismiss those causes of

action from the state court matter, explaining that they were already pending in the Northern

District of California.  Id.; Def. RJN Ex. D.  She clearly did not intend to dismiss her claims

in all forums.  See Zevnik v. Superior Court, 159 Cal. App. 4th 76, 82 (2008) (*res judicata*

doctrine will not apply if considerations of policy or fairness outweigh its purpose in a

particular case).

### 4.    Conclusion as to Rest Break Subclass

Because Plaintiffs have met the requirements of Rule 23(a) and Rule 23(b), the Court

will grant certification of a rest break subclass.

### B.    Off-the-Clock Subclass

Plaintiffs Jimmy Ellison, William Doland and Lynetta Ellison seek to certify a

subclass defined as:

> All non-exempt or hourly paid employees who have been employed at Defendant's
> retail stores in the State of California, and, from December 7, 2002 until the date of
> certification, worked any opening shift, as reflected in AutoZone's SMS System Time
> Final Historical Report or similar records and AutoZone's Alarm Activity Reports or
> similar records.

Ellison Mot. at 4.[11]  Plaintiffs' theory is that Defendant has a "uniform policy, manifested in

actual practice, of requiring that the two employees who open AutoZone stores perform

specified work tasks before they clock in," which "gives rise to predominant common

questions."  Id. at 10.  The Court concludes that common questions do not predominate as to

this claim.

### 1.    Relevant Evidence

---

[11] Only Jimmy Elllison and William Doland are proposed representatives of the off-the-clock
class.  Id. at 18.

Plaintiffs offer significant proof that AutoZone required its employees to perform certain tasks when they arrived to open the store in the morning.  Throughout the class period, AutoZone required two AutoZone employees, a manager and a non-manager, to be present while opening the store.  See id. (citing Sikandar Dep. at 137:14-138:9; Ex. A; Ex. G at AMDL008182).  Once at the store, AutoZone required the employees to perform opening tasks such as unlocking the door, turning the lights on, turning the alarm off, and bringing up any systems.  Id. (citing Sikandar Dep. at 138:10-139:1 (listing tasks employees are supposed to do); Ex. A; Ex. H at ADML003928-30 (May 2011 "Opening Store, Clocking In" document, which notes that an additional minute is added to store-opening employees' times); Ex. I at ADML008611-13 (same); Ex. J at AMDL008686 (undated "Store Quick Open Checklist" listing tasks and stating "TO ENSURE WOW! CUSTOMER SERVICE OPEN YOUR STORE AS SOON AS YOU HAVE TURNED ON THE LIGHTS, CLOCKED IN AND LOADED THE TILLS"); Ex. Q at AMDL009538-39 (June 2011 "Store Quick Open Checklist" listing tasks and stating "TO ENSURE WOW! CUSTOMER SERVICE OPEN YOUR STORE AS SOON AS YOU HAVE TURNED ON THE LIGHTS, CLOCKED IN AND LOADED THE TILLS").  Plaintiffs assert that "[o]nly after those opening tasks are completed could employees then clock in on the store's cash register," although the evidence they cite in support of that assertion merely states that employees must also clock in on a store's cash register.  See id. (citing Sikandar Dep. at 136:17 (employees can clock in on any register); Ex. A; Ex. I at AMDL008611-13 (May 2011 "Opening Store, Clocking In" document, which notes that an additional minute is added to store-opening employees' times); Ex. H at AMDL003928-3930 (same)).  AutoZone has an electronic

timekeeping system called "SMS," which reflects employees' clock in and out times.

Id. (citing Sikandar Dep. at 28:18-29:1; Ex. A).  The only way for an employee to clock-in is

at a register, and AutoZone does not have any forms for employees to fill out if they are

required to work off-the-clock.  Id. (citing Sikandar Dep. at 28:18-29:1; 30:9-12; 31:10-20;

105:3-108:17; 109:1-18; Ex. A; Dessem Dep. at 94:3-25; Ex. F).  Before May of 2011,

AutoZone had no policy of procedure for capturing the time spent off-the-clock between

when the alarm was deactivated and employees clocked in at the beginning of the day.  Id.

(citing Dessem Dep. at 92:1-92:7; Ex F; Ex. H at ADML3928-30; Ex. M at ADML7471-72;

Ex. I at ADML8611-13).

AutoZone also has a uniform policy forbidding off-the-clock work.  The handbook

provides:

> AutoZoners who work on an hourly basis
> *       must be compensated for all the hours they have worked, and
> *       are not permitted to work off the clock
> -          before or after clocking in
> -          by deducting a meal break that is not taken
> -          doing any work, such as clean up, paperwork or work that "should
>           have" been completed during the scheduled shift, or
> -          for any reason on their own time.
>
> Important!
> *       AutoZoners who believe their time has not been recorded accurately must
>         notify their manager immediately so the time can be accurately recorded.
> *       Never volunteer or agree to work off the clock or falsify time records.
>         AutoZoners who do this are subject to immediate termination.

Ellison Opp'n at 4-5 (citing Jon Decl. Ex. B at ADML007369; see also Ellison Dep. at

76:12-79:3).  Every day, employees receive a receipt showing their total hours worked for

the day and the week; they are expected to report to the manager if their time is not accurate.

United States District Court
For the Northern District of California

Id. at 5 (citing Jon Decl. ¶ 10; Ex. B; Doland Dep. t 68:4-19; 69:1-70:16; Brewer Decl. Ex. B).  Violation of AutoZone's off-the-clock policy is grounds for discipline, including termination.  Id. at 4 (citing Jon Dec. ¶ 10).

Plaintiff's expert compared the SMS time records and alarm records between 2003 and August 2009, and found that there are many hours of uncompensated time from when employees disarmed alarms to when they clocked in.  See Ellison Mot. at 11 (citing Phillips Decl. Ex. 2 at 7 (reporting, for example, 22,692 uncompensated hours in 2003, and 25,491 uncompensated hours in 2005).

Plaintiffs also present evidence from Plaintiffs Jimmy Ellison and William Doland, and from 13 other putative class members, stating that they were systematically not paid for work done before clocking in.  See id. at 12 (citing J. Ellison Decl. ¶¶ 4-7; Doland Decl. ¶¶ 4-7; Compendium of Class Member Declarations[12]).  Defendant counters that putative class member evidence with 133 declarations from putative class members attesting that they never performed any off-the-clock work, of if they did, that they never reported it.  See Waggoner Decl. Ex. A (Summary of Putative Class Member Declarations on off-the-clock issue).

## 2.   Defendant's Arguments

In the face of this evidence, Defendant argues that the off-the-clock claims were never

---

[12] For example, Rolando Aguilera asserts that he typically worked for about five or ten minutes turning the computers on and stocking merchandise while he waited for the computers to start, and that he was not compensated for that time.  Id. Ex. 1 ¶¶ 5-6.  Rocio Alvarado asserts that he completed tasks not finished from the night before for ten minutes while his manager disengaged the alarm, and that he was not compensated for that time.  Id. Ex. 2 ¶¶ 6-8. Matthew Crespin asserts that for five to ten minutes he turned on the registers and computers before clocking in, put the trash cans outside and lay floor mats throughout the store while he waited for the computers and registers to start; he also states that he was not compensated for that time.  Id. Ex. 3 ¶¶ 6-7.

United States District Court
For the Northern District of California

pled, common issues do not predominate, Plaintiffs are not typical class members, and the putative class is not ascertainable.  The Court finds that Defendant prevails based on its commonality argument.

Assuming the truth of Plaintiffs' expert's conclusions, there is sometimes a gap of uncompensated time between when a store's alarm was shut off and when a putative class member clocked in.  But that does not mean that there is a common answer to the question of why that is so.  See Dukes, 131 S. Ct. at 2551 ("What matters to class certification . . . is . . . the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation") (internal quotation marks omitted).  The "why" here is particularly elusive in light of Defendant's official policy forbidding off-the-clock work, including specifically off-the-clock work "before . . . clocking in."  See Jon Decl. Ex. B at ADML007369.

Although Plaintiffs rely on Defendants' practice of having two employees open the store, unlock the door, turn lights on, turn the alarm off, and bring up any systems before clocking in, Ellison Reply at 10, they do not actually point to evidence that all store-opening tasks had to be completed before clocking in (although, as Defendant points out, logic suggests that turning on the lights and deactivating alarm systems are "activities employees at any company must perform, lest they work in darkness amidst the blaring of sirens," Ellison Opp'n at 10).  See also Schimmel Ex. J (Store Quick Open Checklist, suggesting that order of activities is (1) Turn lights on; (2) Clock in; (3) Load Cash tills; and (4) Unlock doors.).  Moreover, Defendant's store-opening policy and its policies that "AutoZoners who believe their time has not been recorded accurately must notify their manager immediately so

the time can be accurately recorded," Jon Decl. Ex. B at ADML007369; see also Ellison

Dep. at 76:12-79:3, and that employees are to daily review a printout of their total hours

worked and report to their manager if their time is not accurate, Jon Decl. ¶ 10; Ex. B;

Doland Dep. at 68:4-19; 69:1-70:16; Brewer Decl. Ex. B, are not mutually exclusive.  Put

another way, Defendant's store-opening policy was not that employees should perform a

certain list of tasks and not be compensated for them.  This case is therefore distinguishable

from Bibo v. Federal Express, 2009 U.S. Dist. LEXIS 37597, at *37 (N.D. Cal. Apr. 21,

2009), in which the employer's uniform policy explicitly stated: "[e]xcept for certain

approved preliminary and postliminary activities, no employee should perform work 'off the

clock' for any reason" (emphasis added).

In Brinker, 53 Cal. 4th at 1051, the Supreme Court of California noted that "[t]he only

formal Brinker off-the-clock policy submitted disavows such work. . . . [n]or has [plaintiff]

presented substantial evidence of a systematic company policy to pressure or require

employees to work off the clock, a distinction that differentiates this case from those he relies

on in which off-the-clock classes have been certified."  The court noted that "liability is

contingent on proof that Brinker knew or should have known off-the-clock work was

occurring," and concluded that "[n]othing before the trial court demonstrated how this could

be shown through common proof, in the absence of evidence of a uniform policy or

practice."  Id. at 1052.  The court found that individual issues would predominate, requiring

an employee-by-employee inquiry of "who worked off the clock, how long they worked, and

whether Brinker knew or should have known of their work."  Id.

Here, as in Brinker, there is a uniform policy prohibiting off-the-clock work.  In light

United States District Court
For the Northern District of California

of that policy, Plaintiffs must present substantial evidence that AutoZone requires its employees to work off-the-clock. <u>See id.</u> at 1051. Plaintiffs present evidence that AutoZone requires employees to perform opening tasks, <u>see</u> Sikandar Dep. at 138:10-139:1; Ex. A; Ex. H at ADML003928-30; Ex. I at ADML008611-13; Ex. J at AMDL008686; Ex. Q atAMDL009538-39), but not that AutoZone does not provide a means for employees to be compensated for those tasks. Although Plaintiffs can point to the declarations of Plaintiffs Jimmy Ellison, William Doland, and 13 other putative class members, all stating that they were systematically not paid for work done before clocking in, <u>see</u> J. Ellison Decl. ¶¶ 4-7; Doland Decl. ¶¶ 4-7; Compendium of Class Member Declarations, Defendant's 133 putative class member declarations attesting to never having performed or reported any off-the-clock work, <u>see</u> Waggoner Decl. Ex. A, undermines the notion that Defendant "knew or should have known that off-the-clock work was occurring," <u>see</u> <u>Brinker</u>, 53 Cal. 4th at 1052.

Moreover, the off-the-clock work described in many of Plaintiffs' putative class member declarations – stocking merchandise, doing work from the night before, taking trash cans outside, <u>see, e.g.</u>, Compendium of Class Member Declarations Exs. 1, 2, 3 – goes well beyond the door-unlocking, light-turning-on, alarm-turning-off, and systems-starting work of which Defendant does not dispute it knew. <u>See</u> Ellison Reply at 10 ("[n]or does [AutoZone] dispute that the same policy required the Store Opening employees to perform opening tasks such as . . ."). This suggests that if and when such off-the-clock work occurred, the reasons for it varied. <u>See</u> <u>York v. Starbucks Corp.</u>, No. 08-7919, 2011 U.S. Dist. LEXIS 155682, at *83-*87 (C.D. Cal. Nov. 23, 2011) (where company had "a clear and unambiguous corporate policy mandating that all employees be paid for work performed," and plaintiff failed to

24

present evidence of a systematic, corporate-wide practice of forcing employees to work off-the-clock, resolution of plaintiff's claim would "require individualized proof that she in fact did the work, why she did the work, why she did not use the [system for receiving compensation], and whether her managers had reason to know that she was in fact working without pay."). Because there is no "common answer to the 'why' question," id. at *88, common questions do not predominate here.

### 3.     Conclusion as to Off-the-Clock Subclass

Because Plaintiffs have failed to demonstrate that common questions predominate, the Court denies certification of this subclass.

### C.     Meal Break Subclass

Plaintiffs Jimmy Ellison, William Doland and Lynetta Ellison seek to certify a subclass defined as:

> All non-exempt or hourly paid employees who have been employed at Defendant's retail stores in the State of California at any time on or after July 29, 2005 until the date of certification.

Ellison Mot. at 4-5. Plaintiffs assert that Defendant's meal break policy violates California law because it does not require Defendant to secure on-duty meal period agreements for employees who are required to remain on the premises during a meal period. See Ellison Mot. at 17. Plaintiffs rely on Labor Code section 512, IWC Wage Order No.7, and 8 California Code of Regulations section 11070 subdivision 11(c), which provides that "[a]n 'on-duty' meal period shall be permitted only when the nature of the work prevents an employee from being relieved of all duty and when by written agreement between the parties an on-the-job paid meal period is agreed to." Plaintiffs also point to Brinker, 53 Cal.4th at

536, which held that:

> When someone is suffered or permitted to work . . . for five hours, an employer is put
> to a choice: it must (1) afford an off duty meal period; (2) consent to a mutually
> agreed-upon waiver if one hour or less will end the shift; or (3) obtain written
> agreement to an on duty meal period if circumstances permit.

Plaintiffs maintain that their "theory of liability is premised on the legality of Defendant's

uniform written meal period policy, which did not obtain on-duty meal period agreements for

any employees who were required to stay on the premises during their meal breaks."  Ellison

Mot. at 17.  The Court concludes that Defendant's meal break policy does not help Plaintiffs'

case as much as they would like.

### 1.    Relevant Evidence

Throughout the relevant time period, Defendant's uniform written meal break

policy, which applied to all California AutoZone employees, was this:

| An AutoZoner who works... | Is provided... |
| --- | --- |
| more than 5 hours per day | A meal period of not less than 30 minutes.  The meal period must begin no later than 4 hours and 59 minutes into the AutoZoner's shift.<br><br>Exception: If the total hours worked is no more than 12 hours, the second meal period may be waived by mutual consent of management and the AutoZoner. |

26

| more than 10 hours per day | 2 meal periods of not less than 30 minutes each. |
| | |
| | Exception: If the total hours worked is no more than 12 hours, the second meal period may be waived by mutual consent of management and the AutoZoner but only if the first meal period was not waived. |

If management requires the AutoZoner to remain at the store or facility during the meal period, the meal period must be paid.

Jon Decl. Ex. A.

The only other evidence Plaintiffs point to is the declarations from Plaintiffs William Doland and Lynetta Ellison. Doland declared: "when working shifts of over 6 hours, my supervisor would sometimes require me to remain in the store during my meal period . . . However, I do not recall receiving an additional hour of pay when AutoZone required me to remain in the store during my meal period." Doland Decl. ¶ 11. Ellison declared: "there were several occasions during my employment with AutoZone that when working shifts of over 6 hours, my supervisor would sometimes require me to remain in the store during my meal period. . . . I . . . do not recall receiving an additional hour of pay when AutoZone required me to remain in the store during my meal period." Lynetta Ellison Decl. ¶ 7. Neither Doland nor Ellison recalled signing a written on-duty meal period agreement during their employment. Id. ¶ 7; Doland Decl. ¶ 11.

Defendants submit the declarations of eighty-five putative class members stating that they are free to take, and regularly do take, off-duty meal periods away from the store. Waggoner Decl. Ex. C. Defendants also note that Plaintiff Jimmy Ellison (not a proposed

27

representative for the meal period class) testified that he was free to and frequently did leave the store during meal periods.  Jimmy Ellison Dep. at 179:20-180:5; 184:15-18.

### 2. Defendant's Arguments

Defendant's arguments against certification of the meal period subclass are: (a) the on-duty meal period agreement was never pleaded or identified; (b) Plaintiffs have failed to demonstrate the common questions predominate; (c) Plaintiffs' claims are not typical; and (d) the subclass is overbroad and not ascertainable.  These arguments have merit.

### a. Theory Never Disclosed

Defendant argues that neither Doland's nor Lynetta Ellison's complaints even mention on-duty meal periods.  Ellison Opp'n at 8.  In addition, it argues that it propounded interrogatories to discover the theories behind the meal period claim, and that Plaintiffs never mentioned the failure to obtain on-duty meal period agreements.  Id. (citing Waggoner Decl. Ex. J, Response to Interrogatory No. 12).  Both of these contentions appear to be true. Plaintiffs reply only that "both William Doland and Lynetta Ellison alleged in their complaints and discovery responses that Defendant failed to provide meal breaks to its employees."  Ellison Reply at 14.  They also claim that Doland testified to these violations during his deposition, although the portion of Doland's deposition they cite to states only that there were times when he was so busy that he "could not take a rest break."  See id. at 15 (citing Cheng Decl. Ex. D, Doland Dep. at 112:18-114:4).

It appears as though Plaintiffs had intended to claim that Defendant denied employees meal periods, but then changed course at the last minute and proceeded with its current no-agreement theory.  This is not particularly fair to Defendant.  Nonetheless, Defendant has not

28

made any showing as to how it was prejudiced by having been sandbagged (was there additional discovery it would have sought?). And there are bigger problems with this proposed subclass.

### b.      No Common Questions Predominate

Defendant's argument that common questions fail to predominate, Ellison Opp'n at 17-20, is true. The Court has three primary concerns as to commonality.

First, there is no common policy as to on-duty meal period written agreements. See Jon Decl. Ex. A. Defendant has a uniform written policy, but it says that "[i]f management requires the AutoZoner to remain at the store or facility during the meal period, the meal period must be paid." Id. It is silent as to written agreements. See Kurihara, 2007 U.S. Dist. LEXIS 64224, at *28 (uniform policy has to give rise to liability to support class certification). Although Plaintiffs interpret this as the meal break policy "fail[ing] to obtain on-duty meal period agreements for any employees who were required to stay on the premises during their meal breaks," Ellison Reply at 15, such agreements are simply not addressed. As the court explained in Wong, 2011 U.S. Dist. LEXIS 125988, at *16 and n.11, the absence of a policy bears on the question of whether an employer has made something available (in that case, meal and rest breaks), but does "not preclude the need to examine whether [the things] were in fact made available to the individual" employees. In other words, the absence of a policy does not provide a common issue that would support class certification.

Second, Plaintiffs have not demonstrated that there is a common practice regarding written agreements. The only employees the Court is aware of who say that they have never

United States District Court
For the Northern District of California

signed written agreements when they have worked through meals are Doland and Lynetta Ellison.  See Doland Decl. ¶ 11, Lynetta Ellison Decl. ¶ 7.  Two people do not demonstrate the existence of a common a practice.

Third, what the law forbids is making employees work through their meal breaks without signing written agreements: working through meal breaks and not signing written agreements are both required elements.  Plaintiffs seem to acknowledge this.  See, e.g., Ellison Mot. at 15 ("whether Defendant's uniform meal period policy failed to obtain written mutual consent to an on-duty meal period in accordance with California law when AutoZone required employees to stay on premises during their meal periods") (emphasis added).  But Plaintiffs skip entirely over trying to show that employees were regularly forced to work through meal breaks – or even that it happened more than "sometimes" to just two AutoZone employees.  See Doland Decl. ¶ 11, Lynetta Ellison Decl. ¶ 7; see also Waggoner Decl. Ex. C (declarations from 85 putative class members that they are free to take, and regularly do take meal periods away from store).  Without that evidence, the written agreements are irrelevant.  There is no evidence before the Court that Defendant regularly forced its employees to work during meals, let alone that, when it did so, it failed to have them sign written agreements.

In the absence of such common evidence, the Court would need to make individual inquiries as to why individuals did, occasionally, miss meal periods.  See Sultan v. Medtronic, Inc., No. 11-4132, 2012 U.S. Dist. LEXIS 107046, at *5 (C.D. Cal. July 23, 2012) ("reasons that employees fail to take breaks can be manifold: the employee could have forgotten, wanted to finish assignments, were not hungry, did not want to leave the premises,

**United States District Court**
For the Northern District of California

wanted to leave early or, possibly, were manipulating their timecards").[13]  Other courts have

denied certification in the "absence of any explicit [employer policy] to which the missed

meals can be attributed and in light of the individualized inquiries necessary to evaluate the

[employer practices] as to meal breaks."  See, e.g., Wren v. RIS Inventory Specialists, 256

F.R.D. 180, 208-09 (N.D. Cal. 2009).  The Court finds that these individual inquiries would

predominate over common questions.

### c.    Not Typical

Defendant also argues that Doland and Lynetta Ellison are not typical because they

assert that they were "sometimes" required to remain at the store during meal periods, while

none of the other class members make such allegations.  Ellison Opp'n at 21.  Plaintiffs

object to this attempt to "infer from their testimony the complete nonexistence of any policy

or occurrence of missed meal breaks."  Ellison Reply at 16 n.9.  But there is a complete

failure to demonstrate a policy or practice of missed meal breaks, and so Doland and

Ellison's claim to have sometimes missed meal breaks is, based on the current record,

atypical.  In addition, the Court cannot know whether their claims are typical of the class

because it knows so little about the class as pertains to written agreements.

### d.    Overbroad/Not Ascertainable

Finally, Defendant argues that the proposed class – "All non-exempt or hourly paid

employees who have been employed at Defendant's retail stores in the State of California at

any time on or after July 29, 2005 until the date of certification," is both overbroad and

unascertainable given that the written policy at issue did not require a single employee to

---

[13] Employees could also have forgotten to clock out.

work on-duty meal periods.  <u>See</u> Ellison Opp'n at 21.  Plaintiffs' response, that "the policy itself applied to all California store employees during the relevant time period," Ellison Reply at 15 n.9, ignores the actual language of the policy.  Presuming Plaintiffs had met all of the other requirements for class certification, the class definition could be amended to say something like "all California store employees who were required to work through their meal periods without signing a written agreement to do so," but they have not met those other requirements.

### 3.      Conclusion as to Meal Break Subclass

Plaintiffs failed to disclose their written agreement theory, have not demonstrated that common questions predominate, are not typical of the class, and defined the class too broadly.  Accordingly, the Court denies certification as to the meal break subclass.

### D.      No Travel Reimbursement Subclass

Plaintiff Haydee Escalante seeks to certify a class defined as:

> All California-based "Gray Shirt" employees employed by Defendant during the time period from August 4, 2006 through the present, to whom Defendant failed to fully reimburse mileage for the use of their personal vehicles for work-related duties, as required by Labor Code § 2802.

Escalante Mot. at 2.[14]  Plaintiff argues that "[t]his is a simple pay policy case," about the legality of "Defendant's policy of not reimbursing all affected employees for their mileage expenses after using their personal vehicles for required work-related tasks."  <u>Id.</u> at 1.  The Court does not agree.

---

[14] As previously mentioned, she also seeks to certify a derivative subclass of the exact same individuals, alleging that the same actions constitute a violation of the UCL.  <u>Id.</u>

United States District Court
For the Northern District of California

### 1.     Relevant Evidence

Plaintiff presents three types of evidence in support of certifying a "no travel reimbursement" class: (a) evidence of Defendant's reimbursement policies; (b) her own experiences; and (c) a small sampling of putative class member experiences, paired with a telephone study conducted by Initiative Legal Group of 576 "Gray Shirt" employees.

### a.     Defendant's Travel Reimbursement Policies

Much of Plaintiff's evidence about Defendant's travel reimbursement policies comes from Azeem Sikandar.  Id. at 3.  Sikandar testified that Defendant can require Gray Shirts to drive their personal vehicles to perform work-related tasks, such as driving to other store locations, picking up parts, or making deliveries.  Id. (citing KTB Decl. Ex. 1 at 63:7-12).  Defendant uses an "AutoZoner Expense Reimbursement" policy, which applied to all of Defendant's employees during the class period.  Id. (citing KTB Decl. Ex. 1 at 20:8-22:19; KTB Ex. 4).  Sikandar testified that this Policy was not provided to Gray Shirts, but that Gray Shirts can access the policy via Defendant's "Policy Center," an online database of employee documents.  Id. at 3-4 (citing KTB Decl. Ex. 1 at 22:6-23:19).

Defendant also used an "AutoZone Travel Policy," which provided that, for trips of 10 miles or less, employee should use their own personal vehicle, document the odometer measurements, and submit an expense report for reimbursement."  Id. at 4 (citing KTB Decl. Ex. 5 at 18).[15]  And Defendant had a "Personal Vehicle for Company Business" policy, which also applied to Gray Shirts using their personal vehicles for company business.

---

[15] That Policy also states that "Mileage is reimbursed according to the current mileage reimbursement rate ($0.30 per mile)."  Id.  That language is the basis for the next proposed subclass.  Escalante Mot. at 2.

Id. (citing KTB Decl. Ex. 6; Ex. 1 at 51:12-15, 52:9-14).  That Policy required that any Gray Shirt-provided car used for company business must meet five criteria, and Sikandar testified that it was up to Gray Shirts to make sure they meet all the criteria on the list.  Id. (citing KTB Decl. Ex. 1 at 52:15-21; 68:8-15).

If AutoZoners seek reimbursement under these Policies, there are two ways they can be reimbursed.  The first is through a "Disbursement Reporting System," summarized in a policy called "Accounts Payable to AutoZoners."  Id. at 5 (citing KTB Decl. Ex. 1 at 76:23-77:1;  Ex. 7).  That policy explains that a Gray Shirt can submit an expense reimbursement request to the reimbursement reporting system, which is approved to be paid out by accounts payable, and then is paid out in the same manner that normal wages are paid.  Id. (citing KTB Decl. Ex. 1 at 7:15-78:2).  Sikandar testified that all California Gray Shirts had access to the expense reporting system at all California stores, although putative class members disagree. Compare KTB Decl. Ex. 1 at 29:23-30:6 with KTB Decl. Exs.16-24.

The second manner of bring reimbursed is through the "Cash Paid Out Electronic System," dealt with in the "Paid Out Policies" document.  Escalante Mot. at 5 (citing KTB Decl. Ex. 1 at 78:5-79:6; 31:10-32:18; Ex. 8).  Under this policy, reimbursements are paid out as cash; an electronic entry is made, a receipt prints out and is signed by the Gray Shirt, and then it gets put in the store's file.  Id. (citing KTB Decl. Ex. 1 at 31:10-32:18).  Cash payouts purportedly indicate by reason code the type of expense reimbursement.  Id. (citing KTB Decl. Ex. 1 at 82:1-8).

Plaintiff does not dispute that, if reimbursement was sought under either reimbursement method, employees were in fact reimbursed.  Id. at 5.

**United States District Court**
For the Northern District of California

### b.      Plaintiff Escalante's Experiences

Plaintiff Escalante worked for Defendant since 2004; after six months, she was promoted to Part Sales Manager, a full-time Gray Shirt position. Id. at 6 (citing KTB Ex. 2 at 21, 25:20-22, 27:2-25). She worked at three different AutoZone stores. Id. (citing KTB Ex. 2 at 28:5). She was eventually promoted to Assistant Store Manager, and was terminated in 2010. Id. (citing KTB Ex. 2 at 36:7-9).

Plaintiff recalls receiving one or two copies of Defendant's Store Handbook during her employment, which she asserts contains no reference to mileage reimbursement. Id. (citing KTB Ex. 2 at 139:10-19; Ex. 9).[16] She testified that she was not aware that AutoZone even had a written travel policy and could not recall seeing any Policy Center documents regarding reimbursement. Escalante Mot. at 6 (citing KTB Ex. 2 at 157:11-15, 152:17-155:19, 156:23-24).

Plaintiff consistently used her personal vehicle for work-related tasks such as picking up parts. Id. (Citing KTB Ex. 2 at 43:1-25). Plaintiff occasionally did product pick-up on her way into work or her way home from work. Id. at 7 (citing KTB Ex. 2 at 109:2-25, 118:14-119:8). Plaintiff also used her personal vehicle for driving to Defendant's trainings and meetings. Id. (citing KTB Ex. 2 at 123:16-25). She recalls asking her store manager if she would receive mileage reimbursement for the use of her personal vehicle, and her store manager telling her that Defendant would not reimburse mileage for picking up and delivering parts. Id. (citing KTB Ex. 2 at 125:6-13, 127:7-23). She was also told that "the

---

[16] The Court notes that the Handbook does say that it is only a guide and not an exhaustive statement of AutoZone policies, and it explains how to log onto the Policy Center. See KTB Ex. 9 at 68.

**United States District Court**
For the Northern District of California

numbers came first," suggesting that she could not be reimbursed because the stores had to make their numbers. <u>Id.</u> (citing KTB Ex. 2 at46:6-47:19). Therefore, she never requested reimbursement. <u>Id.</u> at 7-8 (citing KTB Ex. 2 at 128:4-6). When she complained to management about the lack of reimbursement, she was made to feel like doing so was not going the extra mile. <u>Id.</u> at 8 (citing KTB Ex. 2 at 158:8-10). Plaintiff might have received mileage reimbursement one or two times at her last store. <u>Id.</u> (citing KTB Ex. 2 at 125:14-20). She never heard of any of Defendant's employees being reimbursed for mileage-related expense. <u>Id.</u> (citing KTB Ex. 2 at 158:17-19). In addition, she never used Defendant's "paid-out" procedure, and never received, nor saw anyone else receive, a pay-out for mileage reimbursement. <u>Id.</u> (citing KTB Ex. 2 at 130:14-18, 131:16-21).

### c.      Putative Class Members' Experiences

Plaintiff submits eight class member declarations, which attest to experiences consistent with Plaintiff's. <u>See</u> KTB Exs. 16-24. They describe occasionally using their personal vehicles for work tasks such as picking up or delivering parts, and attending meetings and trainings. <u>Id.</u> Like Plaintiff, few of them knew about AutoZone's mileage reimbursement policy or knew about Defendant's Policy Center. <u>Id.</u> Joe Mata asked about mileage reimbursement and was told that AutoZone did not pay for that. <u>See</u> KTB Ex. 21 ¶9. Rudy Morales and Alvaro Gomez were both told that their hourly pay somehow accounted for such expenses. <u>See</u> KTB Exs. 22 ¶ 7, 23 ¶ 9. Juan Vaca was told that only district manager get mileage reimbursements, <u>see</u> KTB Ex. 23 ¶ 7, and Pablo Ceja was just told no, <u>see</u> KTB Ex. 16 ¶7.

In addition to this anecdotal evidence, Initiative Legal Group conducted a study with

**United States District Court**
For the Northern District of California

1    576 Gray Shirt employees about various allegations in this multi-district litigation.  See KTB

2    Ex. 14.  This study is discussed in the declaration of Plaintiff's expert, Sean Berger.  Id.

3    Notably, Defendant has moved to strike Berger's declaration, Plaintiff has filed an opposition

4    brief, and Defendant has filed a reply brief.  See dkts.110, 119, 155.  The motion to strike

5    argues that Berger's report is unreliable – because it contains conclusions based primarily or

6    entirely on the ILG survey, see Waggoner Decl. Ex. G (letter from Plaintiff's counsel

7    confirming that only a spreadsheet with survey responses was provided to Berger), but does

8    not provide any background information about the survey, such as the wording of the

9    questions asked – and that it discloses material provided for the sole purpose of mediation,

10   and violates the Stipulated Protective Order.  (This last issue was cured by the document's

11   filing under seal.)  Defendant attacks Berger's declaration on the same grounds in its

12   Opposition to class certification.  See Escalante Opp'n at 19-20.

13        The Court grants the motion to strike.  Courts are to "query . . . whether expert

14   evidence is 'useful in evaluating whether class certification requirements have been met.'"

15   See Kurihara, 2007 U.S. Dist. LEXIS 64224, at *13.  "If the basis of the expert opinion is . . .

16   so flawed that it would be inadmissible as a matter of law, then it should not be considered."

17   Id. (internal quotation marks omitted).  See also Ellis v. Costco Wholesale Corp., 657 F.3d

18   970, 982 (9th Cir. 2011) (finding, post-Dukes, that Daubert analysis is appropriate at class

19   certification stage.)   Here, Berger's opinions and the survey itself do not meet industry

20   standards and are improper, because they do not appear to be based on a scientific method.

21   For example, neither reveals how the survey was fielded nor how the respondents were

22   chosen.  See Saad Decl. ¶¶ 4, 9-25.  Defendant and the Court have no way of assessing the

reliability of Berger's conclusions.[17]

### 2.   Defendant's Arguments Against Certification

In the face of this evidence, Defendant argues that Plaintiff's claims are not typical, the class is not ascertainable, and that Plaintiff has not presented common evidence of common questions.  The Court agrees as to the last two arguments and will address them.

### a.   Not Ascertainable and Fail Safe

Defendant argues that the "no reimbursement" subclass is not ascertainable, both because it is overbroad and because it is an impermissible "fail safe" class.

Defendant is correct that the subclass is overbroad.  "A class definition should be precise, objective, and presently ascertainable," though "need not be so ascertainable that every potential member can be identified at the commencement of the action."  O'Connor v. Boeing N. Am., Inc., 184 F.R.D. 311, 319 (C.D. Cal. 1998) (internal quotations omitted).  In addition, a class that includes those who have not been harmed is both imprecise and overbroad.  See Mazur v. eBay Inc., 257 F.R.D. 563, 567 (N.D. Cal.,2009).  Here, the proposed class includes AutoZone employees who never sought reimbursement. See Escalante Mot. at 2 (defining class as including employees "whom Defendant failed to fully reimburse").  Such employees have no standing to sue for failure to reimburse, absent evidence that AutoZone knew or should have known that they incurred reasonable and necessary business-related expenses.  See Stuart v. Radioshack Corp., 641 F. Supp. 2d 901, 903-04 (N.D. Cal. 2009) (employer's duty under California Labor Code § 2802 only

---

[17]  Plaintiff asks that, if the Court strikes Berger's report, the Motion for Class Certification be "briefly continued" to allow time to file a supplemental report from Berger and to conduct additional discovery from ILG.  See Opp'n to Mot. to Strike at iii.  That request is denied.

United States District Court
For the Northern District of California

triggered if employer knew or had reason to know that the employee incurred the expenses). This failing could be corrected by amending the class definition so that it reads: "all employees who sought and did not receive reimbursement for mileage," but, as currently framed, the definition is overbroad.[18]

There is also some merit to Defendant's argument about a fail safe class. Plaintiff defines the class as including only employees "to whom Defendant failed to fully reimburse all mileage. . . ." Escalante Mot. at 2. This is problematic because it seems to define the class in such a way that "the class members either win or are not in the class . . . the Court cannot enter an adverse judgment against the class." See Genenbacher v. CenturyTel Fiber Co. II, 244 F.R.D. 485, 488 (C.D. Ill. 2007); see also Dodd-Owens v. Kuphon, Inc., No. 06-3988 JF, 2007 WL 420191, at *3 (N.D. Cal. Feb. 5, 2007) (striking the words "who have experienced gender discrimination . . ." from a class definition on the ground that it created a "fail-safe class"); see also Brazil v. Dell, No. 07-1700, 2008 WL 2693629, at *7 (N.D. Cal. July 7, 2008) (striking class definitions because class defined as all persons who purchased Dell computer products that "Dell falsely advertised").

Importantly, however, it is not clear that the Ninth Circuit forbids fail-safe classes. In a recent memorandum disposition, the Ninth Circuit explained that fail safe classes are "palpably unfair to the defendant," and are also "unmanageable– for example, to whom should the class notice be sent?" See Kmar v. Radioshack Corp., No. 09-55674, 2010 WL 1473877 (9th Cir. April 14, 2010). But as the Central District noted, the Ninth Circuit does

---

[18] Moreover, Plaintiff's attempts to reply to the ascertainability arguments in the Opposition consist of only defending the 30-cent class. See Escalante Reply at 7-9.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

not seem to have "explicitly held that fail-safe classes are precluded." <u>See</u> <u>Heffelfinger v. Elec. Data Sys. Corp.</u>, No. 07-101 MMM, 2008 WL 8128621, at *10 n.57.

<u>Heffelfinger</u> noted that the Circuit had held, in the context of whether a poorly-drafted class definition justified denying certification outright, that "[i]t is implicit in the definition of the class that its members are persons who claim to have been [wrongfully denied benefits]." <u>Id.</u> (citing <u>Vizcaino v. United States Dist. Court for W.D. Wash.</u>, 173 F.3d 713, 722 (9th Cir. 1999)). However, <u>Vizcaino</u> left a district court broad discretion, <u>Heffelfinger</u> concluded, "to define [a] class to avoid the 'fail-safe' problem." <u>Id.</u> (further noting "the court has discretion either to redefine the class or to afford plaintiffs an opportunity to do so").

Rather than denying certification on the basis of the fail safe definition, the Court would have discretion here to redefine the class as "all employees who sought and did not receive reimbursement for mileage," which seems to avoid both ascertainability problems. This problem is therefore not insurmountable.

### b.     No Convincing Evidence of Common Questions

Although the ascertainability problems can be remedied, the commonality problems cannot be.

Defendant argues that there is no common contention capable of class-wide resolution. <u>See</u> <u>Dukes</u>, 131 S. Ct. at 2551 ("common contention . . . must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."). Plaintiff speaks repeatedly of a uniform policy. <u>See, e.g.</u>, Escalante Mot. at 1 ("Defendant's policy of not reimbursing all affected employees for their mileage expenses"),

United States District Court
For the Northern District of California

id. ("there is absolutely no need to examine or analyze any individual class member's claims, given that all putative class members were subject to a single reimbursement policy"), 2 ("Defendant has treated all putative class members in an identical manner regarding mileage reimbursements, with no individual analysis"), 16 ("Defendant uses a flat, across the board policy regarding reimbursement generally"), id. ("There is an undisputably common policy applied to all class members."); Escalante Reply at 3 ("the commonality requirement . . . can be satisfied with evidence of a uniform business expense reimbursement policy").

But, strangely omitted from her discussion is this: Defendant's actual written travel policy permits reimbursement. See KTB Decl. Ex. 5 at 18 (AutoZone Travel Policy, providing that, for trips of 10 miles or less, employee should use their own personal vehicle, document the odometer measurements, and submit an expense report for reimbursement."). Defendant also has policies outlining how to be reimbursed.  KTB Ex. 7 ("Accounts Payable Payments to AutoZoners" policy); 8 (AutoZone "Paid Out Policies").  The uniform policies therefore weigh against, not for, certification.  See Dukes, 131 S. Ct. at 2253 (where Wal-Mart's announced policy forbid sex discrimination and plaintiffs' additional evidence did not amount to "'significant proof' that Wal-Mart 'operated under a general policy of discrimination.").[19]

This was precisely Judge Conti's conclusion in Chavez v. Lumber Liquidators, No. 09-4812 SC, 2012 U.S. Dist. LEXIS 40984, at *29-30 (N.D. Cal. Mar. 26, 2012), where he recently denied certification of a "no reimbursement" class, holding that common issues did

---

[19] Plaintiff does not assert that Defendant has a uniform, although unwritten, policy of denying reimbursement despite what the written policies say.

**United States District Court**
For the Northern District of California

not predominate:

> Plaintiffs have not shown that LLI instituted a uniform policy resulting in the denial [of] reimbursement requests.  In fact, LLI's Travel and Entertainment policy (T&E Policy) allows for reimbursement of a number of business-related expenses, including mileage. . . . Accordingly, to assess the merits of Plaintiffs' reimbursement claim, the Court would need to scrutinize each class member's claimed expenses.  Specifically, the Court would need to make individualized factual determinations concerning: (1) whether the claimed expenses were 'necessary' and incurred in direct consequence of the discharge of the employee's duties; (2) whether the employee actually sought reimbursement from LLI for the expenses; and (3) whether LLI reimbursed the employee for the expense.

Id.  Judge Conti noted that the second inquiry would be critical because some class members might not have sought reimbursement.  Id. at *30; see also Morgan v. Wet Seal, Inc., No. A133590 (Cal. Ct. App. Oct. 12, 2012), Def.'s Statement of Recent Decision Ex. A at 25 (holding, where applicable written policies expressly state that employees may seek reimbursement for work-related travel, district court made "accurate observation that, in order to prove those claims, plaintiffs would have to produce evidence beyond the written policies themselves.").

Because Defendant had a uniform policy to provide reimbursement, because Plaintiff failed to offer significant proof that Defendant had a uniform policy or practice of denying reimbursement, and because Defendant has offered numerous putative class member declarations demonstrating that Gray Shirts were routinely reimbursed, the Court holds that Plaintiff has failed to demonstrate convincing evidence of common questions.

### 3. Conclusion as to "No Travel Reimbursement" Subclass

Accordingly, the Court denies certification of a "no travel reimbursement" subclass

### E. Thirty-Cent Reimbursement Subclass

42

**United States District Court**
For the Northern District of California

Plaintiff Haydee Escalante also seeks to certify a class defined as:

All California-based "Gray Shirt" employees employed by Defendant during the time period from August 4, 2006 through the present, to whom Defendant reimbursed mileage for use of their personal vehicles for work-related duties at the rate of thirty cents per mile.

Escalante Mot. at 2. The disposition of this subclass is straightforward.

Unlike the "no travel reimbursement" subclass, here there is in fact a common issue susceptible to common proof: a uniform policy. The AutoZone Travel Policy states that "Mileage is reimbursed according to the current mileage reimbursement rate ($0.30 per mile)." KTB Decl. Ex. 5 at 18. Defendant's person most knowledgeable, Sikandar, testified that he had no idea how the thirty cents per mile number was calculated, or why Defendant did not use the IRS rate. Escalante Mot. at 6 (citing KTB Decl. Ex. 1 at 37:23-38:10). Plaintiff argues that simply picking an arbitrary number without having tied it to any approximation of actual costs is insufficient to satisfy Gattuso v. Harte-Hanks Shoppers, Inc., 42 Cal.4th 554, 569 (2007), which requires full and complete reimbursement. Id. at 12. That legal argument is either correct or it is not.

The problem is one of typicality. Typicality requires that a class representative "possess the same interest and suffer the same injury" as the putative class. See Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 156 (1982). Plaintiff Escalante does not have the same injury as the putative class; she was never reimbursed at the thirty-cent rate (or, as far as she can recall, at any other rate). She therefore has no standing. See O'Shea v. Littleton, 414 U.S. 488, 494 (1974) ("if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on

43

behalf of himself or any other member of the class").  Plaintiff hardly disputes this point in her Reply brief, arguing that "Plaintiff's claims are typical of the Classes she seeks to represent in that she was required to routinely use her personal vehicle without proper reimbursement."  Escalante Reply at 7.  That argument does not address the fact that she was never reimbursed at the thirty-cent rate.

Accordingly, the Court denies certification of the thirty-cent reimbursement class**.**

**IV.    CONCLUSION**

For the foregoing reasons, the Court (1) GRANTS in part the Ellison Motion, as to the rest break subclass, and DENIES that Motion as to the meal break and off-the-clock subclasses; and (2) DENIES the Escalante Motion in its entirety.

**IT IS SO ORDERED.**

Dated:  December 21, 2012

_____
HON. CHARLES R. BREYER
UNITED STATES DISTRICT
JUDGE